UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **EFFIE JOHNSON NORMAN,** *et al.*<br><br>Plaintiffs,<br><br>vs.<br><br>**FCA US, LLC,**<br><br>Defendant. | **2:22-CV-11393-TGB-CI**<br><br>**OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS**<br><br>**(ECF NO. 16)** |

In this proposed class action, four named plaintiffs are suing FCA over an unspecified cluster of defects in model year 2016-2022 RAM 1500 vehicles. They allege that the defects cause water to leak into the vehicles through the rear window—resulting in moisture that plays havoc with a number of the vehicle's systems. Their 21-count, 110-page complaint seeks damages under a variety of legal theories under the laws of several different jurisdictions.

FCA moves to dismiss Plaintiffs' claims on several grounds. ECF No. 16. For the reasons explained below, the motion will be **GRANTED**.

## I.     BACKGROUND

### A. General Allegations

Plaintiffs are individuals who purchased model year 2016-2022 RAM 1500 vehicles. They allege that defects in their vehicles allow water to leak into their rear cabins—causing not only cosmetic damage, foul

1

odors, mold, and mildew, but also rear cabin airbag contamination and interference with electrical systems, which can manifest itself through issues with locks, windows, headlights, tail lights, interior lights, windshield wipers, the push-to-start ignition system, the climate control system, the infotainment system, the navigation system, and the back-up camera. First Am. Compl., ¶¶ 4-5, ECF No. 14.

The exact nature of the defect is unclear from the complaint. Plaintiffs attribute their damages alternately to: (1) FCA's alleged failure to adequately design and manufacture the Class Vehicles' rear cabin windows, rear cabin brake lights, auxiliary antennas, and related seals; or (2) FCA's failure to adequately design and manufacture the body of the Class Vehicles, so that the frames and chassis do not twist or flex and cause cracks in the windows. ¶¶ 50-51. Put another way, the complaint describes a number of symptoms, not a cause or defective component, so it is unclear whether there is one defect or two.

While Plaintiffs do not describe the nature of the defect with specificity, they say that FCA nevertheless has known about it since at least 2016—and *should* have known about it earlier, through presale testing. ¶ 8. According to the complaint, FCA's knowledge of the defect can be inferred from five sources: (1) an increase in consumer complaints about the defect submitted to the National Highway Traffic Safety Administration (NHTSA), ¶ 101; (2) complaints on online forums, on which FCA maintains accounts and through which FCA provides

2

customer support, ¶ 123; (3) correlating increases in warranty claims, ¶ 122; (4) presale testing, ¶¶ 96-100; and (5) three service bulletins issued by FCA in 2021, providing guidance on troubleshooting issues with water leaking into the vehicles through the rear cab, ¶¶ 52-59.

In the operative complaint, Plaintiffs cite thirty-eight complaints submitted to NHTSA about Class Vehicles. It is not apparent that all these complaints relate to the alleged defect. Many complaints pre-dating 2019 concern generalized issues and do not mention or clearly relate to water intrusion. *See e.g.*, ¶ 102 (October 2016 complaint about flickering headlights); ¶ 103 (November 2016 complaint about headlights turning off); ¶ 104 (June 2017 complaint about electrical issues); ¶ 105 (January 2018 complaint about flickering headlights); ¶ 106 (May 2018 complaint about electrical issues); ¶ 107 (July 2018 complaint about camera). Only two complaints pre-dating 2019 mention rain or water. ¶¶ 108-109.

Plaintiffs provide no details regarding presale testing or the alleged increase in warranty claims. But they speculate that, "[f]or every one complaint filed with NHTSA, FCA likely receives hundreds or thousands of related warranty claims." ¶ 122.

As for the web forums, Plaintiffs mention a thread on 5thgenrams.com started on May 18, 2019, titled "Water Stained Headliner above Rear Window." ¶ 123. They allege that FCA operates an account on and provides customer support through this and other forums, but they do not include hyperlinks to or printouts of any specific threads.

3

*Id.* Nor do they describe any specific interactions by FCA personnel with consumers on the forums.

Plaintiffs attach the three service bulletins to their complaint. One, issued on February 15, 2021, concerns complaints that "water is leaking into the cab through the third brake light" and instructs technicians to add a secondary seal at the top of the brake light. ECF No. 14-3. The second, issued on April 15, 2021, identifies an issue with "water leak rear of cab rear seat or headliner," and specifies four possible causes: (1) a cracked rear window/frame; (2) incorrect back window seal; (3) rear brake light; (4) antenna. ECF No. 14-4. The final bulletin, issued on April 22, 2021, identifies issues with "water leaks from the cab back, evident on rear seats, carpet, and potentially roof." ECF No. 14-5. It instructs technicians to "inspect the rear sliding glass assembly from inside the cab, looking for cracks in the frame," and to replace parts if cracks are detected. *Id.* None of the bulletins authorize out-of-warranty repairs.

Class Vehicles are subject to a Limited Vehicle Warranty, which applies for 36 months or 36,000 miles, whichever comes first:

> The Basic Limited Warranty covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defect in material, workmanship or factory preparation. There is no list of covered parts since the only exception are tires and Unwired headphones.

¶¶ 139-140, ECF No. 14.

There are some exclusions and limitations. Windshields, for instance, are covered for only 12 months or 12,000 miles. ¶ 141; ECF No. 14-19.

According to Plaintiffs, rather than disclosing or fixing the defect, FAC actively concealed it, marketed their vehicles as being durable and reliable, attempted to limit applicable warranties, and refused to perform repairs to correct the defect. ¶¶ 127-44, ECF No. 14. They allege that FCA-authorized dealerships acted as agents of FCA in these wrongdoings. ¶ 148. Though they acknowledge that some consumers received some received in-warranty repairs, they say these repairs were inadequate because all FCA did was replace defective vehicle components with equally defective vehicle components. ¶ 144.

### B. Plaintiff-Specific Allegations

The four named Plaintiffs each allege unique purchasing circumstances, vehicle issues, and repair efforts.

Plaintiff Effie Norman purchased a used 2019 RAM 1500 with 31,000 miles from Wholesale Auto Plus LLC in Alabama in April 2020. ¶ 20. She still owns the vehicle. ¶ 21. In December 2020, when her car's odometer read 45,000 miles, Norman began noticing intermittent electrical issues with her vehicle. ¶ 22. The failures worsened, and a year later at 53,000 miles, she noticed a foul odor in the vehicle. ¶ 22. In early 2022, Norman noticed her backseat carpet was water-logged and moldy. *Id.* When she presented her vehicle to Stivers RAM, the dealership conducted a moisture test and diagnosed a rear cabin window crack. *Id.*

Her vehicle was out of warranty, so she repaired the window at her own expense. *Id.* She alleges that, to this day, she continues to have issues with the electrical systems and the ignition start button. *Id.*

Plaintiff Trevor Creech purchased a new 2019 Ram 1500 from Moss Bros. Auto Group in California in December 2018. ¶ 28. He still owns the vehicle. ¶ 29. In November 2020, when his vehicle's odometer read under 20,000 miles, Creech noticed two cracks in his rear windshield, along with water leakage and foul odors when it rained. ¶ 30. When he presented his vehicle to Lawley Chrysler Jeep Dodge for repairs, the dealership replaced the vehicle's rear brake lights and a seam that appeared to be causing the cracks. *Id.* He says that the cracks reappeared six months later but not whether his vehicle was still under warranty at that point or whether he attempted another repair. *Id.*

Plaintiff Dez Jones purchased a used 2016 Ram 1500 with 30,000 miles from a Carmax in Georgia in June 2018. ¶ 34. He still owns the vehicle. ¶ 35. In July 2018, when the odometer read approximately 30,500 to 31,000 miles, he began noticing leaks and mold around the gasket and seal of the third break light. ¶ 36. An AutoNation in Georgia diagnosed a defect with the brake light and seal and replaced the seal and the light. *Id.* Jones says that, when the problem returned some months later, AutoNation again diagnosed the same defect but did not perform any repairs. *Id.* He says he experienced mold, a wet interior, and

problems with his power folding side mirrors and power slide window because of the defect. ¶ 36.

Plaintiff Edward McFarland purchased a new 2018 Ram 1500 from Greenville Chrysler Dodge Jeep Ram in Texas in May 2018. ¶¶ 40-41. In December, when the odometer read under 10,000 miles, McFarland began noticing leaks when it rained. ¶ 42. The dealership diagnosed a leak coming from a rear brake light and resealed the light. *Id.* Two years later, when the odometer read 49,000 miles, he again took the car to the dealership, this time complaining of a malfunctioning infotainment system. ¶ 43. The dealership told him that Texas heat was the cause of the problem and undertook repairs, but those repairs were delayed because of the COVID-19 pandemic. *Id.* When the repairs were finally completed some weeks later, McFarland noticed that the cab was covered in mold. *Id.* The dealership told him he would need to seek a remedy through his insurance. *Id.* When his insurance company declared the vehicle totaled, he was forced to purchase a new vehicle. *Id.*

**C. Proposed Class Structure**

Broadly speaking, Plaintiffs' claims fall into four "buckets:" (1) breach of express warranty; (2) breach of implied warranty; (3) fraud-based claims; and (4) unjust-enrichment claims. They define class vehicles as "all model year 2016-2022 RAM 1500 vehicles" and propose five classes, structured as follows:

1. The Nationwide Class: All persons or entities who purchased or leased a Class Vehicle, for a claim of violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 [Count I];

2. The Alabama Class: All persons or entities who purchased or leased a Class Vehicle in Alabama, for claims of: (i) Violation of the Alabama Deceptive Trade Practices Act, Ala. Code § 8-9-1 et seq. [Count II]; (ii) Breach of Express Warranty, Ala. Code §§ 7-2-313 and 7-2A-210 [Count III]; (iii) Breach of Implied Warranty of Merchantability, Ala. Code §§ 7-2-314 and 7-2A-212 [Count IV]; and (iv) Fraudulent Omission [Count V].

3. The California Class: All persons or entities who purchased or leased a Class Vehicle in California, for claims of: (i) Violation of the California Consumer Legal Remedies Act, Cal. Civ. Code § 1750 et seq. [Count VI]; (ii) Violation of the Song-Beverly Consumer Warranty Act for Breach of Express Warranty, Cal. Civ. Code § 1790 et seq. [Count VII]; (iii) Violation of the Song-Beverly Consumer Warranty Act for Breach of Implied Warranty, Cal. Civ. Code. § 1790 et seq. [Count VIII]; (iv) Fraudulent Omission [Count IX]; and (v) Unjust Enrichment [Count X]; and (vi) Violation of the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 et seq. [Count XI].

4. The Georgia Class: All persons or entities who purchased or leased a Class vehicle in Georgia, for claims of: (i) Violation of the Georgia Fair Business Practices Act, Ga. Code § 10-1-390 et seq. [Count XII]; (ii) Breach of Express Warranty, Ga. Code §§ 11-2-313 and 11-2A-210 [Count XIII]; (iii) Breach of Implied Warranty of Merchantability, Ga. Code §§ 11-2-314 and 11-2A-212 [Count XIV]; (iv) Fraudulent Omission [Count XV]; and (v) Unjust Enrichment [Count XVI].

5. The Texas Class: All persons or entities who purchased or leased a Class Vehicle in Texas, for claims of: (i) Violation of the Texas Deceptive Trade Practice Act, Tex. Bus. & Com. Code § 17.01 et seq. [Count XVII]; (ii) Breach of Express Warranty, Tex. Bus. & Com. Code §§ 2.313 and 2A.210 [Count XVIII]; (iii) Breach of Implied Warranty of Merchantability, Tex. Bus. & Com. Code §§

8

2.314 and 2A.212 [Count XIX]; (iv) Fraudulent Omission [Count XX]; and (v) Unjust Enrichment [Count XXI].

## D. Procedural History

Plaintiffs filed the operative complaint on September 29, 2022. ECF No. 14. FCA responded with a motion to dismiss. ECF No. 16.

On June 13, 2023, the Court held a hearing on the motion. At the hearing, the Court requested the parties to submit supplemental briefing addressing the effect of the Sixth Circuit's intervening decision in *Fox v. Saginaw County*, 67 F.4th 284 (6th Cir. 2023), on the claims in this case.

Having reviewed those supplemental briefs (ECF Nos. 30 & 31) and carefully considered the positions advanced in the original briefs and during oral argument, the Court will now resolve the pending motion.

## II. LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests a complaint's legal sufficiency. *See Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In deciding whether a plaintiff has set forth a "plausible" claim, the Court must construe the complaint in the light most favorable to the plaintiff and accept well-pleaded factual allegations as true. *Id.* The standard is liberal but requires a plaintiff to provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Albrecht v. Treon*, 617 F.3d 890, 893 (6th Cir. 2010). A plaintiff falls short if she pleads facts "merely consistent with a defendant's liability" or if the alleged facts do not "permit the court to infer more than the mere possibility of misconduct." *Id.* (internal quotations omitted).

## III.   DISCUSSION

FCA seeks full dismissal of the operative complaint, challenging Plaintiffs' ability to bring claims on behalf of a nationwide class and the adequacy of the allegations forming the basis of their claims for breach of warranty, fraud, and unjust enrichment. Within each of the categories of Plaintiffs' claims, FCA makes several arguments for dismissal. For the sake of completeness, the Court will address each of these arguments in turn. Some claims are subject to dismissal on more than one ground.

### A. Nationwide MMWA Claims

#### 1. Standing

As have nearly all of the auto company defendants sued in the large-scale auto-defect cases that this Court has encountered over the past years, in this case FCA challenges Plaintiffs' standing to prosecute claims on behalf of a "Nationwide Class." ECF No. 16, PageID.1167-68.

FCA argues that, since Plaintiffs do not allege injury in any state other than the four in which they purchased their vehicles, they were not injured in and therefore cannot bring claims under the laws of all fifty states. *Id.* This argument has been raised by defendants in previous cases before this Court, and it has been rejected. *See, e.g.*, *Chapman v. Gen. Motors LLC*, 531 F. Supp. 3d 1257, 1274 (E.D. Mich. 2021); *Bledsoe v. FCA US LLC*, 378 F. Supp. 3d 626, 642 (E.D. Mich. 2019).

Courts in this district have taken different approaches to standing in class-action auto-defect litigation, where groups of plaintiffs seek to pursue claims under the laws of states in which no named plaintiffs have made any relevant purchases. Some defer the Article III standing inquiry to the class-certification stage and treat it alongside the adequacy and predominance analyses required by Federal Rule of Civil Procedure 23. *See Chapman*, 531 F. Supp. 3d at 1274; *Bledsoe*, 378 F. Supp. 3d at 642; *see also Johnson v. FCA US LLC*, 555 F. Supp. 3d 488, 499 (E.D. Mich. 2021) (Leitman, J.); *Gamboa v. Ford Motor Co.*, 381 F. Supp. 3d 853, 884-85 (E.D. Mich. 2019) (Hood, J.); *In re Duramax Diesel Litig.*, 298 F. Supp. 3d 1037, 1088-89 (E.D. Mich. 2018) (Ludington, J.). Others require a named plaintiff connected to each claim asserted at the outset. *See, e.g.*, *Pistorio v. FCA US LLC*, No. 20-11838, 2022 WL 141524, at *6 (E.D. Mich. Jan. 14, 2022) (Cox, C.J.), *Withrow v. FCA US LLC*, No. 19-13214, 2021 WL 2529847, at *6-*9 (E.D. Mich. June 21, 2021) (Michelson, J.);

11

*Wozniak v. Ford Motor Co.*, No. 17-12794, 2019 WL 108845, at *1 (E.D. Mich. Jan. 4, 2019) (Murphy, J.).

As this Court has explained in the past, the source of this tension is how an Article III "injury" is conceptualized in the class-action context. *See Chapman*, 531 F. Supp. 3d at 1273. Supreme Court precedent firmly establishes that the "irreducible constitutional minimum of standing" consists of three elements: (1) an injury in fact, (2) fairly traceable to the defendant's conduct, (3) that is likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Class actions, however, are "exception[s] to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (internal quotations omitted); *see also Langan v. Johnson & Johnson Consumer Cos., Inc.*, 897 F.3d 88, 93 (2d Cir. 2018) ("Through Rule 23, Congress has authorized plaintiffs to bring, under limited circumstances, a suit in federal court on behalf of, not just themselves, but others who were similarly injured.") So what happens when a named plaintiff who has standing to sue in one state attempts to sue on behalf of similarly-situated consumers in other states with laws generally prohibiting the conduct complained of?

The approach of deferring confirmation of Article III standing to the class-certification stage—which this Court has taken in the past—has its roots in a pair of Supreme Court cases, *Amchem Products, Inc v. Windsor*, 521 U.S. 591 (1997), and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999),

which both concerned court-approved settlements in asbestos litigation of elephantine proportions. The plaintiffs were groups of individuals who had been exposed to asbestos, either occupationally or through the exposure of a household member—but not all had manifested asbestos-related health conditions. The cases were never intended to be litigated; the parties had reached settlements before filing them. In both cases, the Supreme Court was confronted with arguments from objectors to the settlements concerning class-member standing—namely, that "exposure only" class members had not yet suffered a concrete injury-in-fact. *See Ortiz*, 527 U.S. at 831-32; *Amchem*, 521 U.S. at 612-13.

In both cases, the Supreme Court declined to reach the arguments about Article III standing. The Court observed that, while Article III courts ordinarily must assure themselves of their jurisdiction before reaching to the merits, under the unique circumstances presented the standing issues would not exist but for the class-certification decisions. The Court reasoned that, since the class-certification decisions were defective and "logically antecedent" to the Article III issues, it was appropriate to treat the class-certification issues before the Article III standing issues. *Ortiz*, 527 U.S. at 831-32; *Amchem*, 521 U.S. at 612-13.

With the passage of time, some courts have come to interpret the *Amchem* and *Ortiz* decisions as standing for the proposition that Article III standing issues may be deferred to the class-certification stage in certain scenarios. *See, e.g., Langan*, 897 F.3d at 95 ("[C]onsidering

13

variations in state laws as questions of predominance under Rule 23(b)(3), rather than standing under Article II, acknowledges the obvious truth that class actions necessarily involve plaintiffs litigating injuries that they themselves would not have standing to litigate.") But the pair of cases ultimately offers scant guidance on how far their suggestion that analysis of Article III standing may sometimes be deferred actually extends. And as noted above, not all courts—even within this district— agree that the proper inquiry at the motion-to-dismiss stage is simply whether the named plaintiffs have standing in some general sense. These other courts demand confirmation of a named plaintiff with Article III standing for *each* and *every* claim raised in the complaint at the outset.

So far this Court has followed the "deferral" approach in the auto-defect litigation it has encountered, and the Sixth Circuit has not said much about the reach of *Amchem* and *Ortiz* in this context. But since this Court last considered the issue, the Sixth Circuit rendered a decision in *Fox v. Saginaw County*, 67 F.4th 284 (6th Cir. 2023). *Fox* does not directly concern auto-defect litigation but provides important guidance on the relationship between Rule 23 and Article III standing.

In *Fox*, a plaintiff alleged that Gratiot County and its treasurer violated the Takings Clause when they seized his property, sold it at foreclosure to satisfy delinquent property taxes, and failed to reimburse him for the difference between the market value of his home and his delinquent taxes. 67 F.4th at 290. Although he acknowledged that only

14

Gratiot County and its treasurer had harmed him personally, he named 26 other counties and their treasurers as defendants in his complaint— and proposed to prosecute claims on behalf of similarly-situated delinquent taxpayers in each of those counties. *Id.* at 290-91.

The district court certified a class comprised of all persons and entities who had owned property in the twenty-seven counties, but the Sixth Circuit reversed the certification decision. *Id.* at 300. It held that, even though the plaintiff alleged that putative class members from other counties had suffered identical injuries at the hands of those counties, he had standing to sue only Gratiot County and could not bring claims against counties that had not injured him. 67 F.4th at 294-96. The court emphasized that, although class actions are intended to streamline litigation, efficiency cannot justify flouting Article III's standing requirement. *Id.* at 296. Instead, each named class representative "must allege an individual injury; they cannot piggyback off the injuries suffered by other, unidentified members of the class. And even when they have incurred an injury, they lack standing to seek class-wide relief that would go beyond remedying that injury." *Id.* at 296. (internal quotations and citations omitted).

In reaching this result, the court of appeals examined Fox's arguments—based in *Amchem* and *Ortiz*—that class-certification issues were "logically antecedent" to the Article III standing issue in the case, so the standing issues could be deferred. *Id.* at 296. The Sixth Circuit

15

rejected the notion that *Amchem* and *Ortiz* permitted a court to delay its standing analysis until it was confronted with a class-certification motion. *Id.* The court explained that the context in which *Amchem* and *Ortiz* had arisen was critical: the decisions did not address standing challenges to named plaintiffs at the *outset* of the litigation but instead concerned standing challenges that arose as a result of a district court's defective and overbroad class-certification decision. *Id.* For that kind of issue, the Sixth Circuit explained, it made sense to consider the propriety of the class certification before the issue of Article III standing. *Id.* But because named plaintiffs are parties at the outset, the Sixth Circuit emphasized, a court "must immediately concern itself with their standing because jurisdictional issues precede the merits." *Id.* at 297.

Briefing on FCA's motion to dismiss was complete before the *Fox* decision was issued, so at oral argument the Court ordered supplemental briefing on how that decision would affect the Court's standing inquiry in resolving the motion. In supplemental briefing, Plaintiffs attempt to distinguish *Fox* by observing that—unlike the *Fox* plaintiff who attempted to proceed against defendants that did not injure him personally—the plaintiffs here are alleging injuries as consumers from different states at the hands of the same defendant. ECF No. 31, PageID.1371-72. They urge that *Fox* stands only for the unremarkable principle that a plaintiff lacks standing if she cannot fairly trace her injury to a defendant. *Id.* They seek refuge in *Fallick v. Nationwide*

16

*Mutual Insurance,* 162 F.3d 410, 423 (6th Cir. 1998), where the Sixth Circuit wrote that, "[o]nce [a plaintiff's] standing has been established, whether a plaintiff will be able to represent the putative class, including absent class members, depends solely on whether he is able to meet the additional criteria encompassed in Rule 23." ECF No. 31, PageID.1374.

But the Court is not persuaded that *Fox*'s holding can be so narrowly cabined. *Fox* emphasizes that "a plaintiff who meets the 'actual-injury requirement' does not thereby obtain a license to sue anyone over anything." 67 F.4th at 293. And the Supreme Court has instructed that "a plaintiff must demonstrate standing for each claim he seeks to press." *DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 352 (2006). This poses a problem for Plaintiffs, particularly because the Magnuson-Moss Warranty Act provides a cause of action only for consumers who claim injury as a result of a defendant's failure to comply with obligations under a written or implied warranty. 15 U.S.C. § 2310(d). State law supplies the basis for what constitutes a breach of those warranties, so "[c]laims under the Magnuson-Moss Warranty Act stand or fall with … express or implied warranty claims under state law." *In re FCA US LLC Monostable Electr. Gearshift Litig.*, 280 F. Supp. 3d 975, 1017 (E.D. Mich. 2017) (Lawson, J.) (internal quotations omitted). Plaintiffs lack standing to sue under the laws of states where they have not been injured. It follows, then, that they cannot bring MMWA claims based in the laws of states in which they have not been injured.

17

Nor does *Fallick* help Plaintiffs. There, the plaintiff was a member of an employee health care plan who challenged how the plan administrator, Nationwide, calculated coverage. 162 F.3d at 411-12. He sought to raise claims on behalf of similarly-situated individuals who were members of other healthcare plans also administered by Nationwide. *Id.* The Sixth Circuit reversed the district court's conclusion that he lacked standing to do so, explaining it was immaterial whether he had participated in *all* the plans which he was challenging because he was asserting a breach of fiduciary duty to all proposed class members by the same defendant. *Id.* at 423. *Fallick* thus concerned legal claims that were identical for all putative class members—*i.e.*, claims for breach of fiduciary duty under ERISA. The same cannot be said of claims premised on the laws of all fifty states that would conceivably form the basis of any MMWA claims.

The Court concludes that, given the clarification provided by *Fox* of the relationship between Article III standing and Rule 23, the issue of standing must be addressed at the motion-to-dismiss stage rather than at the class-certification stage. Because Plaintiffs cannot bring MMWA claims under the laws of states in which they have not been injured, they cannot proceed on behalf of a "Nationwide Class."

## 2. Adequacy of MMWA Allegations

FCA also argues that Plaintiffs' MMWA claim [Count I] fails for a related, but different, reason: their state-law warranty claims are not

properly pleaded. ECF No. 16, PageID.1153. Plaintiffs appear to concede as much but maintain the MMWA claims should survive because they adequately pleaded their state-law claims. ECF No. 22, PageID.1277.

As will be discussed in detail below, although it is correct that to the extent Plaintiffs have adequately pleaded state-law warranty claims, they may proceed on MMWA claims based in the laws of those states, here the state-law warrant claims are not properly pleaded, so all MMWA claims must be dismissed.

## B. Challenges to State-Specific Claims

FCA generally challenges the various "buckets" of Plaintiffs' claims: (1) the warranty claims, (2) the fraud claims, and (3) the unjust enrichment claims. Both parties' arguments would have been greatly aided by discussing the relevant state law governing the claims instead of the conflicting district court decisions upon which they have chosen to rely. *See Smith v. General Motors LLC*, 988 F.3d 873, 875 (6th Cir. 2021) ("Congress commands that we apply the law of the 'several states' in this diversity action. That task, though, is made difficult here because the parties to eschew their obligation to set forth what the law is.")

### 1. Warranty Claims

### (a)      Express Warranty

Plaintiffs' express warranty claims center on the Limited Warranty discussed in the Complaint: 36,000 miles, or three years, whichever comes first, for most components, and 12,000 miles or one year for the

19

rear windshield. ECF No. 14, PageID.607-08, ¶¶ 139-40. Plaintiffs'
ability to adequately plead these claims is hampered by their inability to
pinpoint the exact nature of the defect, because different warranty
periods apply to different vehicle components.

### i.    *Presentment Requirement*

FCA first argues that the express warranty claims fail because no
plaintiff has pleaded facts suggesting that they presented their vehicles
for repairs within the warranty period and were refused. ECF No. 16,
PageID.1154-55. Plaintiffs respond that they *did* present their vehicles
for repair but received only ineffective repairs, so presentment was futile.
ECF No. 22, PageID.1280-81. They also briefly argue that the Limited
Warranty failed in its essential purpose because the repairs FCA offered
were inadequate. *Id.* at PageID.1282-83.

Courts generally agree that plaintiffs raising claims for breach of
an express warranty must give the seller an opportunity to repair or
replace the product. *See, e.g.*, *Harrison v. Gen. Motors, LLC*, No. 21-
12927, 2023 WL 348962, at *9 (E.D. Mich. Jan. 19, 2023) (Michelson, J.);
*Gregorio v. Ford Motor Co.*, 522 F. Supp. 3d 264, 288-89 (E.D. Mich. 2021)
(Michelson, J.). And they are reluctant to allow express warranty claims
to proceed when defects have manifested outside of the warranty period.
*See, e.g.*, *In re Gen. Motors Air Conditioning Mktg. & Sales Practices
Litig.*, 406 F. Supp. 3d 618, 628 (E.D. Mich. 2019) (Leitman, J.); *Rivera v.
Ford Motor Co.*, No. 16-13786, 2017 WL 3485815, at *3-*4 (E.D. Mich.

Aug. 15, 2017) (Goldsmith, J.); *In re Onstar Contract Litig.*, 600 F. Supp. 2d 861, 879 (E.D. Mich. 2009) (Cox, J.).

Applying these principles to the claims of two Plaintiffs, their allegations are insufficient to withstand the motion to dismiss.

Plaintiff Norman (Alabama) alleges that she did not notice any defects until her odometer read 45,000 miles and that she waited several more months and thousands of miles to ask FCA to repair them. ¶ 22, PageID.564. This is far outside of the Limited Warranty period for the windshield or any other component. Under Alabama law, to establish an express-warranty claim, a plaintiff must show that "either the dealer refused to repair or replace the malfunctioning component, or failed to do so within a reasonable time." *Lipham v. Gen. Motors Corp.*, 665 So.2d 190, 192 (Ala. 1995) (quotations omitted). Norman never gave FCA the chance to repair the defect while the car was still under the Limited Warranty, so her express-warranty claim [Count III] must be dismissed.

Plaintiff Creech (California) says that he first noticed cracks in the rear windshield two years after he purchased his car, when the odometer read under 20,000 miles. ¶ 30, PageID.566. This is similarly outside the warranty period; the windshield was warranted only for the first 12 months, or 12,000 miles, and he does not allege any other issues. Moreover, California's Song-Beverly Warranty Act requires plaintiffs to allow a manufacturer "a reasonable number of attempts" to repair a defect before imposing restitution or replacement obligations on a

manufacturer. Cal. Civ. Code § 1793.2(d).  The Act does not define what "a reasonable number" is, but caselaw makes clear that it is more than one. *Silvio v. Ford Motor Co.*, 109 Cal. App. 4th 1205, 1208 (Cal. Ct. App. 2003) ("The statute requires the manufacturer to afford the specified remedies of restitution or replacement if the manufacturer is unable to repair the vehicle 'after a reasonable number of *attempts*.' 'Attempts' is plural. The statute does not require the manufacturer to make restitution or replace a vehicle if it has had only one opportunity to repair that vehicle.") Creech says that he presented his vehicle for repairs only once, so his express-warranty claim [Count VII] must be dismissed.

Plaintiffs counter that, in the *In re Chevrolet Bolt EV Battery Litigation*, No. 20-13256, 2022 WL 4686974, at *33 (E.D. Mich. Sept. 30, 2022), this Court allowed plaintiffs to proceed on the futility exception to the presentment requirement after concluding that they sufficiently alleged "a defect common to all class vehicles; that GM was consistently unable to fix the defect; and that any repairs or mitigation GM offered were insufficient." ECF No. 22, PageID.1281-82. There, the Court concluded that plaintiffs plausibly pleaded that the warranty at issue failed in its essential purpose based on allegations that the defendant was repeatedly unable to repair the vehicle defect alleged. *Id.*

For two reasons, the decision in the *Chevy Bolt* case does not help Plaintiffs. First, they have not adequately alleged the existence of a uniform defect common to class vehicles—far from it. Plaintiffs describe

at least two alternative causes of the moisture-related problems of which they complain: they point to either defective seals or an inadequately designed or manufactured frame as possible causes of the leaks. Second, in the *Chevy Bolt* litigation the defendant acknowledged it was unable to repair the allegedly defective vehicles at the time that the suit was filed. *Id.* at *33. There is no similar concession from FCA here.

Two more Plaintiffs remain: Jones (Georgia) and McFarland (Texas). Both admit that they received in-warranty repairs. So, for their claims, the issue boils down to whether they have plausibly alleged that the Limited Warranty failed in its essential purpose.

Broadly speaking, plaintiffs can allege that a warranty failed in its essential purpose in one of two ways, either: (1) by providing facts suggesting that manufacturers have done nothing but replace one set of defective components with new components that are equally defective; or, (2) by providing facts that plausibly support an inference that a manufacturer is somehow unable or unwilling to perform the necessary repairs. *See, e.g.*, *Johnson v. FCA US LLC*, 555 F. Supp. 3d 488, 501-02 (E.D. Mich. 2021) (Leitman, J.) (concluding that plaintiff adequately stated claim where he alleged that he received in-warranty repair but issue returned "less than six months later"); *Harrison v. General Motors, LLC*, No. 21-12927, 2023 WL 348962, at *11 (E.D. Mich. Jan. 19, 2023) (Michelson, J.) ("Plaintiffs here have adequately pled that even if GM provided them with repairs, the repairs failed to fix the defect. All

23

Plaintiffs, including those whose valve-trains were repaired under warranty, state that the Valve-Train Defect continues to affect their cars …. Some Plaintiffs even allege that they sought repairs multiple times during the warranty period and still experienced the defect.")

Looking at Jones's and McFarland's allegations, the Court concludes that they do not plausibly allege that the Limited Warranty failed in its essential purpose. Jones and McFarland do not plead a series of failed repairs. At best, they took their cars to dealerships once and received an in-warranty repair. They lack sufficient factual allegations supporting an inference that those in-warranty repairs were inadequate.

Plaintiff Jones (Georgia) alleges that he noticed leakage and mold around the gasket and seal of the third brake light when his odometer read somewhere between 30,500 and 31,000 miles. ¶ 36, PageID.567. Because FCA does not argue otherwise, the Court will assume that the 36,000 mile/3-year warranty period applies to the situation. Jones admits that he received a free, in-warranty repair. *Id.* He alleges that the repair fixed the problem until it returned "several months" later. This lack of specificity regarding when the problem returned makes it impossible to determine whether an inference that the in-warranty repair was inadequate is plausible. In Georgia, "[a] breach of such a limited warranty results from the refusal to remedy within a reasonable time or a lack of success in the attempts to remedy." *Hightower v. Gen. Motors Corp.*, 332 S.E.2d 336, 338 (Ga. Ct. App. 1985). From the allegations, it

does not appear that the in-warranty repair was ineffective or that Jones was refused a later repair while his vehicle was still under warranty. As a result, Jones's express-warranty claim [Count XIII] must be dismissed.

Plaintiff McFarland (Texas), meanwhile, alleges that he first noticed water leaking into his vehicle through the rear window when his odometer read under 10,000 miles. ¶ 43, PageID.569. He admits that he received a free, in-warranty repair at that point. *Id.* Apparently these repairs were satisfactory because he alleges no additional problems until two years and 39,000 miles later—when took his vehicle into the dealership for an unrelated reason. Given the passage of time between the initial repair and the discovery of the mold issue that totaled his car, the Court is not persuaded that McFarland has plausibly pleaded that the free, in-warranty repair was inadequate. Accordingly, McFarland's express-warranty claim [Count XVIII] must be dismissed.

### ii.   *Design Defect vs. Materials-and-Workmanship Defect*

As a secondary argument, FCA asserts that written warranties, like the Limited Warranty here, do not encompass design defects such as the one that Plaintiffs have alleged. ECF No. 14, PageID.1156-57. In response, Plaintiffs generally maintain that their complaint plausibly alleges a defect in "materials and workmanship," rather than a "design defect." ECF No. 22, PageID.1278-79.

FCA is correct that some courts have held that written express warranties covering defects in "materials" and "workmanship" generally

25

do not cover design defects. *See, e.g.*, *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1224 (9th Cir. 2015) (collecting cases). Courts also acknowledge, however, that at the motion-to-dismiss stage distinguishing between a design defect and a defect in materials or workmanship is mostly a matter of semantics. *See, e.g.*, *Volin v. Gen. Electr. Co.*, 189 F. Supp. 3d 411, 421 (D.N.J. 2016). This is not a ground on which the motion to dismiss may be granted.

**(b)     Implied Warranty Claims**

### *i.     Merchantability*

FCA argues that Plaintiffs have failed to adequately plead unmerchantability because they have not plausibly alleged that their vehicles failed in their purpose of providing transportation. ECF No. 16, PageID.1158. Because three of four plaintiffs still drive their vehicles, it asserts, the idea that the cars fail to provide transportation is untenable.

But courts have interpreted the "merchantability" of a vehicle as encompassing a broader fitness for use than capable of being driven. As this Court has previously explained, "cars are not merchantable merely because they are able to provide transportation. Rather, to be fit for its ordinary purpose, a standard road vehicle must be able to provide safe and reliable transportation and be substantially free of defects." *Chapman v. Gen. Motors LLC*, 531 F. Supp. 3d 1257, 1276 (E.D. Mich. 2021) (internal quotations omitted).

Plaintiffs generally allege that the water intrusion defect renders their vehicles unfit for use because it can cause foul odors, mold, and mildew, leading to health issues like mold-induced asthma and lung inflammation. ¶ 79, PageID.581. Additionally, they allege that the defect disrupts the vehicles' electrical connections, causing interference with the push-to-start ignition systems, locks, windows, headlights, taillights, interior lights, windshield wipers, climate control systems, infotainment systems, and navigation systems—which can distract drivers and result in traffic violations, inability to provide appropriate road signals, inability to make the windshield wipers work during the rain, and inability to lock or unlock the vehicle. ¶¶ 81-82, PageID.581. Finally, they say that the leaks interfere with the rear-cabin airbag and foul the propellant, creating the same condition present in the recalled Takata bags. ¶ 82, PageID.581.

Given the broad definition of "merchantability" in the vehicle context, these allegations sufficiently allege that the defect affects the driveability, safety, and usefulness of the class vehicles. *See, e.g.*, *Amin v. Mercedes-Benz USA, LLC*, 301 F. Supp. 3d 1277, 1288 (N.D. Ga. 2018) (allegations that accumulations of mold and mildew caused passenger cabin to be unbearable adequately alleged lack of merchantability); *Cholakyan v. Mercedes-Benz USA LLC*, 796 F. Supp. 2d 1220, 1244-43 (C.D. Cal. 2011) (recognizing claim under California Song-Beverly Act for breach of implied warranty based on similar allegations). The motion to

dismiss will not be granted on this ground. The Court notes, however, that the problems personally experienced by the Named Plaintiffs—with the exception of McFarland—do not rise to the severity of the symptoms of the so-called water intrusion defect alleged more generally.

### ii.   Limitation of Implied Warranty by Express Warranty

FCA further argues that the duration of any implied warranty for Plaintiffs' trucks was limited to the same time period as the express warranties. ECF No. 16, PageID.1158.

The Warranty booklets for Plaintiffs' vehicles indeed limit the implied warranties of merchantability to the same time period that applies to the express warranty:

> The warranties contained in this booklet are the only express warranties that FCA US LLC ("FCA US") makes for your vehicle. These warranties give you specific legal rights. You may also have other rights that vary from state to state. For example, you may have some implied warranties, depending on the state where your vehicle was sold or is registered.
>
> *These implied warranties are limited, to the extent allowed by law, to the time periods covered by the express written warranties contained in this booklet.*

ECF No. 16-2, PageID.1176 (emphasis added). As noted above, the express warranty covers the class vehicles generally only for 36,000 miles/3 years—and 12,000 miles/12 months for windshields. Courts in this district have enforced similar limiting provisions. *See Hall v. Gen. Motors, LLC*, No. 19-cv-10186, 2020 WL 1285636, at *11 (E.D. Mich. Mar. 18, 2020) (Leitman, J.). And Plaintiffs have not alleged any defects for

which they did not receive in-warranty repairs that manifested within the time limits of the express Limited Warranty.

Plaintiffs offer two responses. Relying on this Court's decision in *Chapman*, 531 F. Supp. 3d at 1278, they first argue that FCA cannot use the limiting provision in its warranty booklets to evade liability because they are alleging that FCA fraudulently concealed a uniform, latent defect in all class vehicles that rendered the vehicles unmerchantable at the time of sale. ECF No. 22, PageID.1284. The difficulty with this argument is that it is not clear what specific latent defect Plaintiffs are alleging. And for FCA to have fraudulently concealed the defect, it needed to have known what it was. *Roe v. Ford Motor Co.*, No. 18-12528, 2019 WL 3564589, at *14 (E.D. Mich. Aug. 6, 2019) (Michelson, J.).

The operative complaint describes a symptom—water leaking into the vehicle—not a defect, *i.e.*, a defectively designed or manufactured part. Plaintiffs' argument that the warranty clock never started running because FCA fraudulently concealed the defect is therefore unavailing. It is less than clear from the face of the operative complaint whether Plaintiffs are alleging one defect or two: Plaintiffs seek to trace their damages alternatively to defective rear window seals and a defectively designed or manufactured vehicle frame. When pressed on the nature of the defect during oral argument, they were unable to clarify. As Plaintiffs cannot explaine what exactly the defect is, they cannot plausibly allege that FCA knew enough about it to be accused of concealing it.

29

Second, Plaintiffs attempt to argue that the warranty clock does not apply because the Limited Warranty fails in its essential purpose. But, as explained above, Plaintiffs have failed to plausibly allege that the limited warranty failed in its essential purpose.

Accordingly, Plaintiffs' implied warranty claims must be dismissed.

### iii. Additional Alabama and Georgia Law Problems

FCA asserts that the Alabama and Georgia Plaintiffs encounter additional problems with their implied-warranty claims. Specifically, FCA points out that under the law of these states one cannot bring an implied warranty claim on the purchase of a used vehicle, or from a third-party used car dealer who has no connection to FCA, that is, where there no privity between the purchaser and FCA. ECF No. 16, PageID.1159.

Plaintiffs offer no response to FCA's argument regarding used vehicle sales, so the Court will deem these points conceded [Counts IV and XIV]. *See Rouse v. Caruso*, No. 06-10961, 2011 WL 918327, at *18 (E.D. Mich. Feb. 18, 2011), *report & recommendation adopted*, 2011 WL 893216 (E.D. Mich. Mar. 14, 2011) ("[W]hen a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." (internal quotations omitted)).

Plaintiffs do respond to the privity argument, asserting that Georgia and Alabama recognize exceptions to it. ECF No. 22, PageID.1287-88. As to the Alabama claim, they cite a decades-old breach-

30

of-contract case about a development contract, *Sheetz, Aiken & Aiken, Inc. v. Spann, Hall, Ritchie, Inc.*, 512 So. 2d 99, 101-02 (Ala. 1987), along with decisions from various district courts, and assert that a third-party exception exists to the privity requirement. But the Alabama Supreme Court has clearly held that "a claim for breach of an implied warranty is not available against a manufacturer who was not involved in the transaction pursuant to which the complaining party purchased the product." *Rampey v. Novartis Consumer Health, Inc.*, 867 So.2d 1079, 1087 (Ala. 2003).

As to the Georgia claim, Plaintiffs again rely on district court decisions and also cite Georgia Code § 11-2-318. These authorities do not help them. Although § 11-2-318 is titled "Third Party Beneficiaries of Warranties Express or Implied," it is not about privity; it provides that "[a] seller's warranty whether express or implied extends to any natural person who is in the family or household of his buyer or who is a guest in his home if it is reasonable to expect that such person may use, consume, or be affected by the goods." In Georgia, "when a buyer purchases a product from a retailer, and there is no privity of contract between the manufacturer and the buyer, no implied warranty runs from the manufacturer to the purchaser." *McQueen v. Minolta Bus. Sols., Inc.*, 620 S.E.2d 391, 393 (Ga. App. 2005).

Alabama Plaintiff Norman and Georgia Plaintiff Jones both bought their vehicles used from non-FCA authorized dealerships. For these

additional reasons, the Alabama and Georgia implied-warranty claims [Counts IV and XIV] must be dismissed.

## 2. Fraud-Based Claims

The Court begins with FCA's general challenges to Plaintiffs' fraud-based claims and then turn to its arguments addressing each state's laws.

### (a)        Rule 9(b) Specificity

At the outset, FCA argues that Plaintiffs have failed to plead their fraud claims with the degree of specificity required by the federal rules of procedure. ECF No. 16, PageID.1160.

Because fraud claims pose "a high risk of abusive litigation," *Twombly*, 550 U.S. at 569 n.14, Federal Rule of Civil Procedure 9(b) places a heightened pleading requirement on plaintiffs bringing them, requiring them to "state with particularity the circumstances constituting fraud or mistake." Generally, a plaintiff must (1) specify the allegedly fraudulent statements; (2) identify the speaker; (3) identify when and where the statements were made; and (4) explain what made the statements fraudulent. *Republic Bank & Tr. Co. v. Bear Stearns & Co., Inc.*, 683 F.3d 239, 247 (6th Cir. 2012).

Fraud claims come in two flavors: misrepresentation and omission. As FCA notes, Plaintiffs' complaint—which takes digs at FCA for marketing their vehicles as being extremely durable—is less than clear in identifying which kind of fraud they believe occurred. In response,

Plaintiffs assert that they intend to proceed only on fraud-by-omission theories. ECF No. 22, PageID.1288.

Courts have acknowledged that, because of the nature of omissions-based fraud, plaintiffs often "will not be able to specify the time, place, and specific content of an omission as precisely as would a plaintiff in a false representation claim." *See, e.g.*, *Matanky v. Gen. Motors LLC*, 370 F. Supp. 3d 772, 789 (E.D. Mich. 2019) (internal quotations omitted). But this does not allow Plaintiffs to circumvent Rule 9(b)'s heightened standard altogether: they must still specify "the who, what, when, where, and how" of an alleged omission. *Republic Bank & Tr. Co.*, 683 F.3d at 256. More specifically, they must plead: "(1) precisely what was omitted; (2) who should have made a representation; (3) the content of the alleged omission and the manner in which the omission was misleading; and (4) what [defendant] obtained as a consequence of the alleged fraud." *Id.* Generally, they must also plead a duty to disclose. *MacDonald v. Thomas M. Cooley Law Sch.*, 724 F.3d 654, 665 (6th Cir. 2013).

Plaintiffs maintain that they have met their Rule 9(b) burden: they have alleged a "who" (FCA); a "what" (a failure to disclose the water-intrusion defect prior to sale despite knowing about it); a "when" (before sale); a "where" (various channels of information through which FCA sold the vehicles); and a "how" (they would not have purchased the vehicles if they were told about the defect). ECF No. 22, PageID.1289.

Of these five requirements, the Court is most concerned with the "what." Plaintiffs' inability to clarify the precise nature of the defect—*i.e.*, whether the so-called "Water Intrusion Defect" is caused by defective seals or a deeper, structural infirmity in the chassis—and their failure to plausibly plead that FCA knew about either of these possible causes poses problems under Rule 9(b). Usually, Plaintiffs in these large-scale auto-defect cases overcome Rule 9(b) challenges by alleging that an auto-manufacturer knew of a uniformly defective *component*. *See e.g.*, *Chapman*, 531 F. Supp. 3d at 1289-90 (allegations that GM knew of but did not disclose incompatibility of fuel pump with American diesel were sufficient to satisfy Rule 9(b)); *Matanky*, 370 F. Supp. 3d at 790 (allegations that GM knew about and failed to disclose defectively designed cooling system were sufficient to satisfy Rule 9(b)).

Plaintiffs here allege the occurrence of general symptoms or conditions resulting from at least two distinct potential causes, rather than a uniformly defective component. And as discussed in more depth below, they have not plausibly alleged that FCA knew about the symptom prior to sale. Their allegations are thus insufficient to adequately establish the "what" under Rule 9(b).

**(b)      Knowledge at the Time of Sale**

The parties do not dispute that knowledge is an element of omissions-based fraud in all the relevant states. FCA contends that Plaintiffs have presented nothing but generic and conclusory allegations

34

that it "knew or should have known about the alleged defect." ECF No. 16, PageID.1162. The Court agrees.

Plaintiffs respond by pointing to five "buckets" of allegations, urging that they are sufficient in combination to create a plausible inference that FCA knew about the defect: (1) NHTSA complaints dating back to 2016; (2) aggregate data from FCA-authorized dealerships, (3) internal pre-sale testing; (4) complaints on online forums, and (5) the three technical service bulletins from 2021. ECF No. 22, PageID.1290.

But several of these sources have been found by courts to be inadequate to support allegations of knowledge. *See, e.g.*, *Harrison*, 2023 WL 348962, at *4 ("Two of these categories—customer complaints and pre-production testing—are disfavored ways of showing a manufacturer's knowledge."); *Chapman*, 531 F. Supp. 3d at 1288 (not finding "general allegations about pre-release testing, internal tracking systems, or general industry practices to be persuasive by themselves"). And in *Smith v. General Motors LLC*, 988 F.3d 873 (6th Cir. 2021), the Sixth Circuit wrangled with some of them after a district court dismissed fraud claims in a proposed auto-defect class action based on the plaintiffs' failure to adequately allege that the auto-manufacturer had pre-sale knowledge of a safety risk from an allegedly defective dashboard.

*Smith* rejected Plaintiffs' proposition that generalized allegations about pre-production testing were sufficient to show knowledge of the safety risk. 988 F.3d at 884. In so holding, the Sixth Circuit highlighted

the lack of detail about the actual test results. The court concluded that "theoretical results from pre-production tests without accompanying verification that the tests occurred and revealed a safety defect" were insufficient to survive a motion to dismiss. *Id.* at 885.

*Smith* also considered the bearing of customer complaints on the plausibility of an auto-manufacturer's knowledge of a defect. In arguing that the district court erred in dismissing their fraud claims, plaintiffs emphasized their allegations that the auto-manufacturer "began to receive a flood of customer complaints" in the form of "online posts on car websites … and complaints on the NHTSA database about cracks." *Id.* They contended that "because [the auto-manufacturer] monitors online car forums and the NHTSA database, it must have learned about the … defect and still sold affected vehicles." *Id.* The Sixth Circuit was not persuaded that the existence of those complaints was sufficient to show knowledge, however. It began by noting that only one of the complaints connected the defect to a safety issue. *Id.* Ultimately, it held that, absent supporting facts that the auto-manufacturer engaged with or received complaints about the alleged defect, allegations of consumer complaints were not enough to withstand a 12(b)(6) motion. *Id.* ("Without supporting facts that GM engaged with or received complaints about the defective dashboard and its safety risk, the consumer complaints are insufficient to allege that GM knew about the defective dashboard under the 12(b)(6) pleading standard.").

36

Finally, *Smith* addressed allegations about increased warranty claims. The plaintiffs in that case had cited "increased warranty claims" about the dashboard as evidence that the auto-manufacturer knew of the safety defect. *Id.* The court concluded, however, that even if a warranty claim spike supported that the manufacturer knew about increased dashboard repairs, nothing connected those repairs to knowledge of the alleged safety defect—as opposed to a cosmetic issue. *Id.* at 885-86.

Under *Smith*, several of Plaintiffs' "buckets" of allegations fail to establish a plausible basis for inferring that FCA knew about the defect. Plaintiffs provide no detail about pre-production testing or its results. And as FCA points out, Plaintiffs present only a small sampling of anonymous NHTSA complaints about some rear-window leakage—many of which post-date the Named Plaintiffs' vehicle purchases. PageID.16, PageID.1162. They provide no details about warranty data. Moreover, beyond alleging that FCA generally maintains accounts on online car forums, Plaintiffs provide no allegations of any specific engagement by FCA with online consumer complaints. If FCA interacted with consumers in various online car forums about the defect before Plaintiffs purchased their vehicles, such interactions are absent from the complaint.

It is true that, in *Chapman*, this Court discussed allegations about NHTSA complaints in support of its conclusion that the plaintiffs had plausibly pleaded that the auto-manufacturer knew of the defect. 531 F. Supp. 3d at 1288-89. But there, unlike here, the plaintiffs alleged that

NHTSA had actually opened an investigation into the defect that was alleged in that case. Further, plaintiffs alleged that the defendant auto-manufacturer—along with other OEMs—had submitted field data and internal communications about the same defective component to NHTSA in response to the investigation. *Id.* Plaintiffs do not address these distinguishing characteristics of the NHTSA information that supported the claims in *Chapman.* The few anonymous NHTSA complaints offered here about rear-window leakage are not comparable.

That leaves the service bulletins. Other courts in this district have found similar bulletins to be a plausible source of knowledge, since they are usually issued by the manufacturer after an issue has been reported with some frequency. *See Harrison*, 2023 WL 348962, at *5 ("[W]hen GM issues a service bulletin about the precise issue in the precise vehicle that a plaintiff complains of, it is common sense to infer that GM had knowledge of that issue." (internal quotations omitted)). But here there is a timing problem. As FCA points out, all the bulletins on which Plaintiffs rely were issued in 2021. Plaintiffs' vehicle purchases—which occurred between 2018-2020—preceded these bulletins. Plaintiffs cannot rely on these bulletins to plausibly allege FCA had knowledge of the defect when they purchased their vehicles.

Plaintiffs have failed to adequately plead that FCA had the requisite knowledge to be liable for omissions-based fraud, so the fraud claims must be dismissed.

**(c)** **State-specific issues**

Although the Court is dismissing the fraud-based claims on the basis that Plaintiffs have failed to adequately allege that FCA knew about the defect, for the sake of completeness it will discuss FCA's alternative arguments and how the knowledge requirement maps onto each specific state-law claim.

### a. Alabama

#### i. Alabama Deceptive Trade Practices Act, Ala. Code. § 8-9-1 et seq. [Count II]

FCA contends that the Alabama Deceptive Trade Practices Act claim must be dismissed because the Act contains a bar against class actions. ECF No. 16, PageID.1164-65.

The Alabama Deceptive Trade Practices Act broadly outlaws several forms of trade practices considered to be unlawful, including "[r]epresenting that goods or services have … characteristics, … uses, benefits, or qualities that they do not have;" "[r]epresenting that goods … are of a particular standard, quality, or grade … if they are of another;" "[i]ntentionally misrepresenting that a warranty or guarantee confers or involves certain rights or remedies;" and "[e]ngaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." Ala. Code § 8-19-5. It defines a "consumer" as "[a]ny natural person who buys goods or services for personal, family, or household use." Ala. Code. § 8-19-3. It envisions enforcement primarily

through the State Attorney General, *see* § 8-19-4 (enforcement), but it also provides a remedy to any consumer who has been injured by a deceptive business practice with a private right of action, *see* § 8-19-10. There is scant Alabama case law explaining pleading requirements.

The Act contains some limitations. Specifically, in § 8-19-10(f), the Act provides that "[a] consumer or other person bringing an action under this chapter may not bring an action on behalf of a class. The limitation in this subsection is a substantive limitation and allowing a consumer or other person to bring a class action or other representative action for a violation of this chapter would abridge, enlarge, or modify the substantive rights created by this chapter."

Plaintiffs respond that "[f]ederal courts agree that class action bars … are procedural, not substantive." ECF No. 22, PageID.1291. This argument has its roots in the Supreme Court's decision in *Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*, 559 U.S. 393, 411 (2010), which held that—because Rule 23 is procedural, rather than substantive—a federal class action may sometimes proceed where a state class action cannot. In *Lisk v. Lumber One Wood Preserving, LLC*, 792 F.3d 1331, 1336 (11th Cir. 2015), the Eleventh Circuit recognized as much regarding an Alabama Deceptive Trade Practices Act claim— although the decision was issued before the Act was amended in 2016 to add the language that the class-action bar is "a substantive limitation

40

and [that] allowing a consumer … to bring a class action … for violation of this chapter would abridge, enlarge, or modify the substantive rights."

Whatever the merits of FCA's argument regarding the statutory bar on class actions are, the Court concludes that they are more relevant to class certification than a motion to dismiss. They do not preclude Plaintiff Norman from raising an individual claim.

As a secondary argument, FCA argues that Norman has surrendered any claim under the Act because "claims under this statute and common law claims are mutually exclusive." ECF No. 16, PageID.1165. This may be true, but nothing stops her from pleading in alternatives at this stage.

But there remains a bigger problem for Plaintiff Norman under Alabama law. The ADPTA requires an element of knowledge. Alabama courts have held that "the ADTPA is generally written to require some knowledge of false or deceptive conduct on the part of the wrongdoer." *Sam v. Beaird*, 685 So. 2d 742, 745 (Ala. Civ. App. 1996). As discussed in some detail above, the complaint here does not adequately allege FCA's knowledge of the defect. Accordingly, the claim must be dismissed.

## ii. Fraudulent Omission [Count V]

The elements of an Alabama fraudulent claim omission (sometimes called "fraudulent suppression") are: "(1) a duty on the part of a defendant to disclose facts; (2) concealment or nondisclosure of material facts by the defendant; (3) inducement of the plaintiff to act; (4) action by

41

the plaintiff to his or her injury." *DGB, LLC v. Hinds*, 55 So. 3d 218, 231 (Ala. 2010) (internal quotations omitted).

Whether there is a duty to disclose depends on: "(1) the relationship of the parties; (2) the relative knowledge of the parties; (3) the value of the particular fact; (4) the plaintiff's opportunity to ascertain the fact; (5) the customs of the trade; and (6) other relevant circumstances." *Bethel v. Thorn*, 757 So. 2d 1154, 1162 (Ala. 1999). The Alabama Supreme Court has held that, "[w]hen the parties to a transaction deal with each other at arm's length, with no confidential relationship, no obligation to disclose information arises when the information is not requested." *Mason v. Chrysler Corp.*, 653 So. 2d 951, 954-55 (Ala. 1995); *see also Marshall v. Crocker*, 387 So.2d 176, 179 (Ala. 1980) ("[E]very omission to disclose facts, though material, is not necessarily fraudulent.")

Because Plaintiffs have not plausibly alleged that FCA knew about the defect, they have failed to adequately plead a duty to disclose, and the claim must be dismissed.

### b. California

#### i. California Consumer Legal Remedies Act, Cal. Civ. Code. § 1750 et seq. [Count VI]

The California Consumer Legal Remedies Act (CLRA) provides remedies for consumers who suffer damages as a result of an act or practice it declares unlawful in the forms of actual damages, punitive damages, and injunctive relief. Cal. Civ. Code. § 1780. It imposes a pre-

filing notice requirement on Plaintiffs seeking damages. At least 30 days before filing a claim for damages under the CLRA, the consumer must provide notice of the alleged violation and demand that the prospective defendant correct, repair, replace or otherwise rectify the goods or services. Cal. Civ. Code § 1782(a).

FCA contends the CLRA claim must be dismissed because Plaintiffs did not provide the requisite 30-day notice before raising the claim. The Court acknowledges that some federal courts have dismissed CLRA claims with prejudice on this basis. *See, e.g., Cattie v. Wal-Mart Stores, Inc.*, 504 F. Supp. 2d 939, 949-50 (S.D. Cal. 2007). But the California Court of Appeals has expressly disapproved of this approach, rebuking courts which have taken it for "fail[ing] to properly take into account the purpose of the notice requirement"—which is to allow a defendant to avoid liability for damages if it expeditiously corrects the alleged wrongs, rather than to avoid taking any remedial action at all. *Morgan v. AT&T Wireless Servs., Inc.*, 177 Cal. App. 4th 1235, 1261 (Cal. Ct. App. 2009). The Court will decline to dismiss the claim on this ground, as it agrees that "in cases when a defendant has already had more than thirty days' notice after the filing of an otherwise untimely CLRA claim, there is nothing to be gained by dismissing the claim with leave to amend." *Baird v. Samsung Electrs. Am., Inc.*, No. 17-06407, 2018 WL 4191542, at *9 (N.D. Cal. 2018), *rev'd and remanded on other grounds*, 804 F. App'x 481 (9th Cir. 2020).

43

Nonetheless, for other reasons, the claim is still subject to dismissal. "[A]lthough a claim may be stated under the CLRA in terms constituting fraudulent omissions, to be actionable the omission must be contrary to a representation actually made by the defendant, or an omission of a fact the defendant was obliged to disclose." *Daugherty v. Am. Honda Motor Co.*, 144 Cal. App. 4th 824, 126 (Cal. Ct. App. 2006). Some element of knowledge of the defect by FCA is required to create a duty to disclose. *See id.* Because Plaintiffs have failed to adequately allege that FCA knew of the defect, this claim must be dismissed.

### ii. Fraudulent Omission [Count IX]

Analysis of this claim follows the analysis of the CLRA claim. *See Hoffman v. 162 North Wolfe LLC*, 228 Cal. App. 4th 1178, 1185-86 (Cal. Ct. App. 2014) ("As with all fraud claims, the necessary elements of a concealment/suppression claim consist of (1) misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (scienter); (3) intent to defraud (i.e., to induce reliance); (4) justifiable reliance; and (5) resulting damages." (internal quotations omitted)). So it too must be dismissed for failure to adequately allege knowledge.

### iii. California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 et seq [Count XI]

FCA argues that, because Plaintiffs' claim for fraud must fail, their claims for "unfair" and "unlawful" business practices must also fail. ECF

No. 16, PageID.1166. They note that Plaintiffs have not pleaded any facts about any anti-competitive behavior or "immoral" conduct.

Conduct violating the California Unfair Competition Law (UCL) includes "any unlawful, unfair or fraudulent business practice." Cal. Bus. & Prof. Code § 17200. California recognizes three varieties of unfair competition: practices which are unlawful, practices which are unfair, and practices which are fraudulent. *Daugherty*, 144 Cal. App. 4th at 837.

Unlike common law fraud, a UCL claim based on fraud can be shown even without allegations of actual deception, reasonable reliance, or damage. *Id.* at 838. But it still requires plaintiffs to plausibly plead some sort of duty to disclose. *Id.* As noted above, Plaintiffs have not adequately pleaded such a duty because they have not plausibly alleged that FCA knew about the defect before they purchased their vehicles.

As for a UCL claim based on an "unfair practice," California courts consider practices to be unfair if: "the consumer injury is substantial, is not outweighed by any countervailing benefits to consumers or to competition, and is not an injury the consumers themselves could have reasonable avoided." *Id.* at 839. The only act or practice alleged here is a violation of a duty to disclose, which mirrors the analysis above.

A UCL claim may also be based on an unlawful practice. Such a claim could conceivably be premised on the breach of an implied warranty. But since the Court has concluded that Plaintiffs have failed

45

to plausibly plead a breach of implied warranty, they cannot raise a UCL claim under the same theory.

### c. Georgia

#### i. Georgia Fair Business Practices Act, Ga. Code § 10-1-390 et seq. [Count XII]

FCA asserts that the Georgia Fair Business Practices Act claim must be dismissed because Georgia does not permit these claims to proceed as class actions.

The GFBPA prohibits actions that are "deceptive" and "unfair." Ga. Stat. § 10-1-393. It does not require a consumer to prove scienter or an intent to deceive. *Regency Nissan, Inc. v. Taylor*, 391 S.E.2d 467, 470 (Ga. Ct. App. 1990). But it requires more than mere negligence. *Id.* Section 10-1-399(a) creates a private cause of action for any individual "who suffers injury or damages … as a result of consumer acts or practices" it outlaws. But it does not permit consumers to bring suits in a representative capacity. *Id.*

The Court acknowledges that, in *Matanky*, another court in this district dismissed a GFBPA claim on this basis. 370 F. Supp. 3d at 798-99. This Court, however, is not persuaded that the statutory provision barring class actions poses a problem at the motion-to-dismiss stage and declines to dismiss the claim on this basis.

Nonetheless, the elements of an GFBA claim are: "a violation of the Act, causation, and injury." *Tiisman v. Linda Martin Homes Corp.*, 637

S.E.2d 14, 19 (Ga. 2009) (internal quotations omitted). Plaintiffs have not adequately pleaded a violation of the Act because they have not sufficiently alleged an unfair or deceptive action by FCA. At best they are alleging omissions-based fraud and have not sufficiently pleaded the existence of a duty to disclose.

### ii. Fraudulent Omission [Count XV]

Georgia courts label this cause of action one for "fraudulent concealment." "In all cases of fraud involving a concealment of a material of fact, scienter or knowledge of the alleged falsehood, is an essential element of the tort." *ReMax N. Atlanta v. Clark*, 537 S.E.2d 138, 142 (Ga. Ct. App. 2000). "There must be some evidence of the silent party's actual knowledge that the defect exists at the time of the sale from which his moral guilt in concealing it can be inferred." *Id.* (quotations omitted).

In the absence of plausible factual allegations showing FCA's knowledge of the nature of the defect, this claim must be dismissed.

### d. Texas

### i. Violation of the Texas Deceptive Trade Practice Act, Tex. Bus. & Com. Code § 17.01 et. seq. [Count XVII]

To prove a claim under the TDTPA, a plaintiff must establish that a defendant violated a specific prohibition of the Texas Business and Commercial Code §§ 17.46 and 17.50. Presumably, Plaintiffs are alleging that FCA violated the provision prohibiting the failure "to disclose information concerning goods or services which was known at the time of

the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed." Tex. Bus. & Com. Code § 17.46(b)(24).

Such a claim would require Plaintiffs to adequately plead that FCA had knowledge of the defect at the time of sale. Plaintiffs have not plausibly done so, so this claim must be dismissed.

### ii.  Fraudulent Omission [Count XXI]

Texas courts refer to this claim as "fraud by nondisclosure." *See Wise v. SR Dallas, LLC*, 436 S.W.3d 402, 409 (Tex. App. 2014). "The elements of fraud by nondisclosure require (1) a deliberate failure to disclose material facts, (2) by one who had a duty to disclose such fact, (3) to another who was ignorant of the facts and did not have an equal opportunity to discover them, (4) with the intent the listener act or refrain from acting, and (5) the listener relies on the nondisclosure resulting in injury." *Id.*

The complaint's failure to allege fact showing knowledge again requires that this claim must be dismissed.

### 3. Unjust Enrichment Claims

Finally, FCA argues that the unjust-enrichment claims must be dismissed because Plaintiffs pleaded that their cars were sold with express warranties. ECF No. 16, PageID.1166. It further contends that

Plaintiffs have failed to adequately allege that other remedies are inadequate. *Id.* at PageID.1167.

In the *Chevy Bolt* litigation, this Court dismissed unjust-enrichment claims that were raised alongside express-warranty claims on the basis advanced by FCA. 2022 WL 4686974, at *38. That case was different, however, because the defendant-manufacturer admitted that there was an applicable, valid warranty that governed the defect alleged. There is no similar concession here by FCA. As Plaintiffs point out, at this stage in the proceedings they are permitted to plead in alternatives.

Nonetheless, substantive state law requires dismissal of the claims. State law unjust-enrichment claims typically include the following elements: (1) the plaintiff conferred a benefit upon the defendant; (2) the defendant accepted the benefit; and (3) injustice would occur if the defendant did not pay the plaintiff for the value of the benefit. *See Raymo v. FCA US LLC*, 475 F. Supp. 3d 680, 709 (E.D. Mich. 2020) (collecting cases and pleading standards).

To start, Plaintiffs' failure to adequately plead knowledge of the defect poses problems under Alabama law. The Alabama Supreme Court has held that retention of a benefit is unjust when: "(1) the donor of the benefit … acted under a mistake of fact or in misreliance on a right or duty, or (2) the recipient of the benefit … engaged in some unconscionable conduct, such as fraud, coercion, or abuse of a confidential relationship. In the absence of mistake or misreliance by the donor or wrongful conduct

49

by the recipient, the recipient may have been enriched, but he is not deemed to have been *unjustly* enriched." *Mantiply v. Mantiply*, 951 So. 2d 638, 654-55 (Ala. 2006) (internal quotations omitted, emphasis in original). Norman's allegations do not rise to this level.

California, meanwhile, does not recognize unjust enrichment as a standalone claim. *See Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1370 (Cal. Ct. App. 2010) ("There is no cause of action in California for unjust enrichment. Unjust enrichment is synonymous with restitution." (internal quotations and citations omitted)). This Court has recognized as much in the past. *See Chapman*, 531 F. Supp. 3d at 1304; *Raymo*, 475 F. Supp. 3d at 709. Plaintiffs thus have no claim for unjust enrichment under California law.

In Georgia, a plaintiff must plead that she directly conferred a benefit on the defendant. *See Scott v. Mamari Corp.*, 530 S.E.2d 208, 212 (Ga. Ct. App. 2000); *see also Campbell v. Ailion*, 790 S.E.2d 68, 73 (Ga. Ct. App. 2016) ("[A] claim for unjust enrichment exists where a plaintiff asserts that the defendant induced or encouraged the plaintiff to provide something of value to the defendant; that the plaintiff provided a benefit to the defendant with the expectation that the defendant would be responsible for the cost thereof; and that the defendant knew of the benefit bestowed upon it by the plaintiff and either affirmatively chose to accept the benefit or failed to reject it."). This requirement poses

problems for the Georgia plaintiff, who purchased his car used from a non-FCA-authorized dealership.

The failure to adequately plead knowledge also dooms the Texas claim. In Texas, "[u]njust enrichment is typically found under circumstances in which one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage." *Burlington Northern R. Co. v. Southwestern Electr. Power. Co.*, 925 S.W.2d 92, 97 (Tex. App. 1996). None of McFarland's allegations plausibly suggest the requisite level of scienter.

Accordingly, the complaint fails to allege a plausible set of fact supporting claims for unjust enrichment under the relevant state law requirements. These claims must therefore be dismissed.

## IV. CONCLUSION

For the reasons discussed above, FCA's motion is **GRANTED**. As Plaintiffs did not make a request for leave to amend either in their briefing or at oral argument, their complaint will be **DISMISSED WITH PREJUDICE** in its entirety.

**IT IS SO ORDERED**, this 30th day of September, 2023.

BY THE COURT:

/s/Terrence G. Berg
TERRENCE G. BERG
United States District Judge

51